OPINION OF THE COURT
Smith, J.
The primary issue on this appeal is whether 16 USC § 836 (the Niagara Redevelopment Act) and the contracts entered into pursuant to that act, as well as Public Authorities Law § 1005 (5), require the Power Authority of the State of New York (PASNY) to sell 445,000 kilowatts of replacement power produced by the Niagara Project at the cost of producing that power. We hold that nothing in the plain language of the Niagara Redevelopment Act, the contracts entered into pursuant to that act, or Public Authorities Law § 1005 (5) compels PASNY to sell that replacement power at cost.
*675 Pursuant to a 1909 treaty between the United States and Canada, it was agreed that the United States could divert some of the flow of the Niagara River waters for the purpose of generating electric power. By its terms, that 1909 treaty was valid until 1971. Pursuant to a Federal Power Commission (FPC) license, the Niagara Falls Power Company, the predecessor to the Niagara Mohawk Power Corporation (Niagara Mohawk), used that flow for a power project development, Project 16, at Niagara Falls. Project 16 consisted of the Schoellkopf and Adams stations and related facilities, which, together, produced approximately 445,000 kilowatts of power. The Niagara Falls Power Company, and later, Niagara Mohawk, sold the power produced by Project 16 to industries in the western New York area.
Another treaty between the United States and Canada made additional flow of the Niagara River waters available for use by the United States for power production. In 1941, the FPC granted the Niagara Falls Power Company the right to use that additional flow at the Project 16 facilities.
In 1950, the United States and Canada entered into yet another treaty with respect to the use of the flow of the Niagara River waters. That treaty authorized the diversion of additional flow by each country for the production of electric energy. Based on the provisions of the various treaties between the United States and Canada, the Niagara Falls Power Company sold approximately 445,000 kilowatts of hydroelectric power generated at Project 16 to various industries in the BufFalo-Niagara Falls area.
On June 7, 1956, the cliff face above the Schoellkopf station of Project 16 collapsed, causing a rockslide that substantially destroyed that station. All hydroelectric generation at Project 16 was interrupted and many of the industries lost their primary source of inexpensive power. The next year, in an attempt to redevelop the Niagara River water flow for generation purposes, Congress enacted the Niagara Redevelopment Act.
The Niagara Redevelopment Act authorizes the Federal Energy Regulatory Commission, formerly the FPC, to issue a license to PASNY to construct and operate a power project to replace the 445,000 kilowatts of power produced by Niagara Mohawk prior to the destruction of the Schoellkopf station. As a condition of issuing the license, and in order to restore low-cost power to western New York industries, the act provides:
*676 "The licensee shall contract * * * to sell to the licensee of Federal Energy Regulatory Commission project 16 * * * four hundred and forty-five thousand kilowatts of the remaining project power * * * in order as nearly as possible to restore low power costs to such industries and for the same general purposes for which power from project 16 was utilized” (16 USC § 836 [b] [3]).
Pursuant to that authorization, on February 10, 1961, PASNY constructed generating facilities on the Niagara River and entered into Contract NS-1 with Niagara Mohawk. PASNY agreed to sell to Niagara Mohawk 445,000 kilowatts of replacement power to restore the 445,000 kilowatts that Niagara Mohawk once produced at Project 16 and sold to the western New York industries.
Contract NS-1 incorporates the Niagara Redevelopment Act by reference and authorizes Niagara Mohawk to resell the replacement power to industrial customers, including appellants, under separate resale agreements between Niagara Mohawk and those industrial customers. Part E of Schedule NP-S1 of the contract states further that "[t]he rate schedules * * * shall be subject to successive modification by the Authority through the promulgation of superseding rate schedules.” The resale agreements between Niagara Mohawk and appellant industrial customers incorporate this rate provision.
On September 26, 1989, citing the declining value of the dollar, PASNY proposed to gradually increase the rate for the replacement power over a seven-year period. On December 21, 1989, PASNY resolved to increase the rates for replacement power for the years 1990 and 1991. On April 27, 1993, PASNY resolved to further increase the rates for replacement power for the remaining years.
Appellants and others commenced an action challenging the rate increases, alleging breach of contract and promissory estoppel causes of action. Appellants argued that the increased rates exceeded PASNY’s operating costs, and, thus, violated the Niagara Redevelopment Act and the contracts entered into pursuant that act. Appellants also argued that Public Authorities Law § 1005 (5) prohibited PASNY from charging rates which generate revenue in excess of the cost of producing the replacement power. Supreme Court denied PASNY’s motion to dismiss the action. The Appellate Division determined that estoppel was not available here against a *677 government entity, and dismissed the promissory estoppel causes of action; the Court also dismissed the contract causes of action, concluding that the proper remedy for challenging PASNY’s act of rate-making was a CPLR article 78 proceeding (171 AD2d 1031). Accordingly, the Appellate Division converted so much of the action as alleged breach of contract to an article 78 proceeding with leave to the parties to serve an appropriate petition. This Court dismissed, as nonfinal, appellants’ motion for leave to appeal (see, 78 NY2d 949).
Appellants served their article 78 petition, maintaining that the Niagara Redevelopment Act, the contracts issued pursuant thereto, and Public Authorities Law § 1005 (5) require PASNY to sell the replacement power to them at cost, without a profit. Supreme Court determined that PASNY is obligated by the act to sell replacement power at cost, and is prohibited by section 1005 from charging rates which produce revenue in excess of cost. The court ordered a hearing to determine the cost to PASNY of producing replacement power. The Appellate Division reversed, on the law, and dismissed the petition, concluding that the Niagara Redevelopment Act does not require PASNY to sell replacement power at cost, and that Public Authorities Law § 1005 (5) creates no rate protection for industrial consumers (187 AD2d 1027). This Court granted leave to appeal, bringing up for review both Appellate Division orders (81 NY2d 704), and we now affirm.
At the outset, appellants contend that the Appellate Division erred in dismissing their breach of contract and promissory estoppel claims. Appellants assert that since Contract NS-1 and subsequent settlement agreements between PASNY and Niagara Mohawk incorporate by reference the terms of the Niagara Redevelopment Act, and the resale agreements incorporate the terms of Contract NS-1, PASNY breached those agreements by fixing new rates in excess of cost. Appellants argue further that their promissory estoppel claims should not have been dismissed because by selling replacement power pursuant to a contract, respondent was not engaged in a governmental function. We disagree.
The Appellate Division properly dismissed appellants’ promissory estoppel causes of action. Absent an unusual factual situation, "estoppel is not available against a governmental agency engaging in the exercise of its governmental functions” (D’Angelo v Triborough Bridge & Tunnel Auth., 65 NY2d 714, 715-716; Matter of Daleview Nursing Home v *678 Axelrod, 62 NY2d 30, 33). PASNY is a governmental agency existing pursuant to Public Authorities Law § 1002. "[A]n authority, in setting * * * charges for the use of its facilities, [is] engaged in a governmental function” (Carey Transp. v Triborough Bridge & Tunnel Auth., 38 NY2d 545, 551). In setting rates for the sale of hydroelectric power, PASNY was engaged in a governmental function. We discern no unusual factual situation that would warrant a different result. Thus, we conclude that the doctrine of estoppel is not available in this case.
As for the claims originally alleged in contract, the Appellate Division correctly determined that they should be resolved in a proceeding commenced under CPLR article 78 (see, Press v County of Monroe, 50 NY2d 695, 701-702). The provisions of a Federal act, when incorporated by reference into a contract between the parties, are part of the agreement and, indeed, are controlling to the extent inconsistent with other provisions of the contract (Rodriguez & Co. v Moore-McCormack Lines, 32 NY2d 425, 433, n 2; see generally, 22 NY Jur 2d, Contracts, § 226). Appellants allege a violation of the Niagara Redevelopment Act, incorporated by reference into Contract NS-1 and subsequent agreements, but the act requires only "low power costs.”
Appellants’ reliance on Airco Alloys Div., Airco, Inc. v Niagara Mohawk Power Corp. (65 AD2d 378) is misplaced. In that case, the plaintiffs, major industrial facilities in western New York and purchasers of electric power from Niagara Mohawk, sought a mandatory injunction and money damages arising from Niagara Mohawk’s alleged breach of Contract NS-1 between Niagara Mohawk and PASNY. The plaintiffs claimed rights as third-party beneficiaries under the terms of the contract, which incorporated by reference the Niagara Redevelopment Act, and alleged that Niagara Mohawk breached that contract by failing to sell to them all or part of approximately 110,000 kilowatts of replacement power that had been refused by other industries. Holding that New York State courts had jurisdiction over the matter, the Appellate Division stated:
"The language of the complaint describes violations of plaintiffs’ rights under the Act as well as the contract, but the main thrust of the complaint is in contract, which is the basis for the primary relief sought. * * * The claims relating to the *679 contract are the only grounds alleged which would sustain an injunction and money damages, and mere references in the complaint to the Federal act do not divest the State court of its jurisdiction” (id., at 384-385).
Here, however, the focus of the controversy is on an agency’s alleged violation of a Federal statute, not on a breach of an express contractual right, making article 78 an appropriate avenue of redress.
As to the merits of their article 78 proceeding, appellants contend that the plain meaning of the Niagara Redevelopment Act, its legislative history, and PASNY’s actions in keeping the rates for replacement power equivalent to the cost of production for over 30 years require PASNY to limit the rates charged for replacement power to the actual cost of production. Appellants argue further that Public Authorities Law § 1005 (5) prohibits PASNY from generating excess revenue from the sale of the replacement power.
"When [a statute’s] language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of its words” (People ex rel. Harris v Sullivan, 74 NY2d 305, 309). Here, nothing in the plain language of the Niagara Redevelopment Act requires PASNY to sell the power at the cost of production. The statute provides only that PASNY should attempt to restore "low power costs” to industrial consumers in the Niagara Falls area. Similarly, the unambiguous language in the contract between PASNY and Niagara Mohawk and the resale agreements, issued pursuant to the Niagara Redevelopment Act, impose no such requirement. Rather, the contracts authorize PASNY to "successively] modif[y]” the schedule of rates charged for the replacement power through the promulgation of superseding rate schedules.
Nor does the plain language of Public Authorities Law § 1005 (5) prohibit PASNY from charging rates for replacement power which produce revenue in excess of PASNY’s cost of producing that power. Section 1005 (5) provides, in part, that operation of the Niagara and Saint Lawrence hydroelectric projects "shall be considered primarily as for the benefit of the people of the state as a whole and particularly the domestic and rural consumers * * * to secure a sufficiently high load factor and revenue returns * * * at the lowest possible rates.” No similar provision is made for industrial *680 consumers. Moreover, although paragraph (f) provides that PASNY should set rates based on "accurate cost data” and paragraph (h) permits PASNY to change rates based on variations in "operating costs and fixed charges”, nowhere does the statute mandate the sale of replacement power to industrial consumers at the cost of producing that power.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Kaye and Judges Simons, Titone and Bellacosa concur; Judges Hancock, Jr., and Levine taking no part.
Order affirmed, with costs.